IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LAWRENCE TALMAGE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 09-1065 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

**I.    INTRODUCTION**

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Lawrence Talmage and Defendant Michael J. Astrue, Commissioner of Social Security.  Plaintiff seeks review of final decisions by the Commissioner denying his claim for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.*  For the reasons discussed below, Defendant's motion is granted and Plaintiff's motion is denied.

**II.  BACKGROUND**

A.    Factual Background

Lawrence Talmage was born on October 5, 1988.  (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 5, "Tr.," at 93.)  During his early childhood, Plaintiff was somewhat delayed in his ability to walk and talk.  When he was five years old, he was diagnosed with

spondyloepiphyseal dysplasia tarda[1] ("SED"), a rare hereditary disorder that affects only males.  As a result of skeletal deformities, Mr. Talmage underwent surgery on each hip in December 2002 and December 2003.  (Tr. 252.)  He underwent further surgery in June 2005 to remove some pins and screws from his left pelvis and femur that his doctor believed may have been the cause of pain in his knees and back that he experienced following the second surgery.  (Tr. 279, 286.)  In June 2006, Plaintiff's orthopedist, Dr. James O. Sanders, commented that he had "done very well" with the surgeries and was "much more active now [than] he ever was before."  He was not having significant discomfort in his hips at that time, but did experience lower back pain with weather changes. (Tr. 273.)  In June 2007, Dr. Sanders reiterated that Mr. Talmage had done "quite well" and his hips had "not been bothering him for quite a while now."  (Tr. 266.)

Mr. Talmage began experiencing pain in his left ankle in the

---

[1]  Spondyloepiphyseal dysplasia is a group of disorders in which the vertebrae and other bones of the skeleton do not grow normally. ("Spondylo" refers to the spine, "epiphyseal" to the growing ends of bones, and "dysplasia" to abnormal growth.)  In SED tarda, the child's skeleton may appear normal at birth, with the condition becoming apparent later in life, typically between four years old and puberty when the bones of the trunk and hips fail to develop.  Physical characteristics of the disorder include mild to moderate disproportionate trunk shortening (dwarfism), moderate to severe spinal deformities, such as scoliosis and exaggerated lumbar lordosis, barrel-chest, pain or stiffness in the back or hip, progressive symptomatic osteoarthritis of the hips and knees developing at an early age, and mild angular deformities of the lower extremities.  *See* www.emedicine.medscape.com/ article/1260836-overview, last visited January 22, 2010.

spring of 2006 which was attributed to a defect in the talar.[2] (Tr. 273.)   The condition was treated conservatively with physical therapy and an ankle brace to be used only when he was having significant discomfort.   (Tr. 273-274.)

In April 2007, Mr. Talmage injured his right elbow (Tr. 270), and in October 2007, fractured his left elbow when he fell backward.   (Tr. 241.)   Plaintiff underwent arthroscopic surgery in March 2008 to remove a piece of loose cartilage in his left elbow. (Tr. 238.)   By May, he was able to resume his full activities as tolerated.   (Tr. 244.)

As a child, Mr. Talmage was diagnosed with attention deficit hyperactivity disorder.[3]   In high school, he participated in regular classes with learning support in English, math and study skills.   (Tr. 158.)   Plaintiff graduated from high school in 2007, but did not pursue additional vocational training or further education.   (Tr. 39.)   He later stated he never had even a part-

---

[2]   The talar is the highest of the tarsal bones of the foot which together with the tibia and fibula forms the ankle joint.   See www.mercksource.com, Dorland's Medical Dictionary for Healthcare Consumers ("Online Dorland's"), last visited January 28, 2010.

[3]   Attention deficit hyperactivity disorder ("ADHD"), is a problem of inattentiveness, over-activity, impulsivity, or a combination thereof, usually developing in childhood.   Depression, sleep deprivation, learning disabilities, tic disorders, and behavior problems may be confused with, or appear along with, ADHD.   About half of all children with ADHD will continue to have troublesome symptoms of inattention or impulsivity as adults.   However, adults are often more capable of controlling behavior and masking difficulties.   See medical encyclopedia at the National Institute of Medicine's on-line website, www.nlm.nih.gov/medlineplus, last visited January 27, 2010.

time job and had never applied for any type of work.  (Tr. 41.)

B.   <u>Procedural Background</u>

On October 25, 2006, Mr. Talmage protectively applied for supplemental security income benefits, alleging disability as of January 1, 2003, due to SED, arthritis, spinal stenosis[4] and disc compression.   (Tr.  94-97,  103-112.)   The  Social  Security Administration denied Mr. Talmage's application on April 2, 2007, concluding he could perform "a narrow range" of light, unskilled work.  (Tr. 59-65.)

Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"), which was held on August 26, 2008, before Judge Donald M. Graffius.  Mr. Talmage, who was represented by counsel, testified, as did a vocational expert. (See hearing transcript at Tr. 34-58.)  Judge Graffius issued his decision on September 17, 2008, again denying benefits.  (Tr. 12-21.)

The Appeals Council advised Mr. Talmage on June 8, 2009, that it had chosen not to review this decision, finding no reason under its rules to do so.  (Tr. 1-4.)  Therefore, the September 17, 2008 opinion became the final decision of the Commissioner for purposes of review.  42 U.S.C. § 405(h); <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 549-550 (3d Cir. 2005), citing <u>Sims v. Apfel</u>, 530 U.S. 103, 107 (2000).  On August 13, 2009, Plaintiff filed suit in this Court

---

[4]   Stenosis is defined as an abnormal narrowing or contraction of a body passage or opening.  See Online Dorland's.

seeking judicial review of the ALJ's decision.

    C.    Jurisdiction

        This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

**III. STANDARD OF REVIEW**

    The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401; Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002) "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d

Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV. **ANALYSIS**

### A. The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[5] currently existing

---

[5]  According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities." "Gainful work activity" is the kind of work activity usually done for pay or profit.

in the national economy.  The impairment must be one which is expected to result in death or to have lasted or be expected to last not less than twelve months.  42 U.S.C. § 1382c(a)(3)(C)(I); <u>Morales v. Apfel</u>, 225 F.3d 310, 315-316 (3d Cir. 2000).  The claimant must also show that his income and financial resources are below a certain level.  42 U.S.C. § 1382(a).

To determine a claimant's rights to SSI benefits,[6] the ALJ conducts a formal five-step evaluation:

(1)   if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

(2)   if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

(3)   if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4)   if the claimant retains sufficient residual functional capacity ("RFC")[7] to perform his past relevant work, he is not disabled; and

(5)   if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can

---

[6]   The same test is used to determine disability for purposes of receiving either disability insurance benefits or SSI benefits. <u>Burns</u>, 312 F.3d at 119, n.1.  Therefore, courts routinely consider case law developed under both programs.

[7]   Briefly stated, residual functional capacity is the most a claimant can do despite his recognized limitations.  Social Security Ruling 96-9p defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

perform other work that exists in the local, regional or
national economy, he is not disabled.

20 C.F.R. § 416.920(a)(4); *see also* Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to
present evidence to support his position that he is entitled to
Social Security benefits, while in the fifth step the burden shifts
to the Commissioner to show that the claimant is capable of
performing work which is available in the national economy.[8] Sykes
v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Graffius first noted
that Mr. Talmage had not engaged in substantial gainful activity
after October 25, 2006, the date on which he applied for disability
benefits. (Tr. 14.)  In resolving step two, the ALJ found that Mr.
Talmage's impairments included SED tarda, spinal stenosis,
borderline intellectual functioning, a cognitive disorder not
otherwise specified, attention deficit hyperactivity disorder, and
a reading disorder, all of which were considered severe because
they had more than a minimal impact on Plaintiff's ability to
perform work-related activities.  (Id.)  At step three, the ALJ
concluded none of Plaintiff's impairments, considered singly or in
combination, satisfied the criteria of any relevant Listing.  That
is, Plaintiff's SED, arthritis, and spinal stenosis did not satisfy

---

[8]   Step three involves a conclusive presumption based on the
listings, therefore, neither party bears the burden of proof at that
stage.  Sykes, 228 F.3d at 263, n.2, *citing* Bowen v. Yuckert, 482 U.S.
137, 146-147 n.5 (1987).

any part of Listing 1.00 dealing with disorders of the musculoskeletal system, and his mental impairments did not satisfy any part of Listing 12.00.  (Tr. 14.)

At step four, the ALJ concluded Plaintiff retained the residual functional capacity

> to perform light work. . . except that [he] is limited to occasional standing and walking, 2 hours out of an eight hour work day, must avoid stooping, kneeling, crouching, crawling, and climbing ladders, ropes and scaffolds, must avoid cold temperature extremes, excessive vibration, and extreme dampness and humidity, is limited to simple, routine, repetitive tasks, not performed in a fast paced production environment, involving only simple, work-related decisions, and in general, relatively few work place changes, is limited to occupations that require no prolonged reading for content and comprehension and no jobs requiring math calculations.

(Tr. 15.)

The ALJ noted that at the hearing, the vocational expert, Ms. Irene H. Montgomery, had testified that a person with the above-described limitations could work assembling small products, as a weight recorder or scales operator, or as a product inspector/packager, all of which were considered "light" jobs.[9]

---

[9]  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b) and 416.967(b).  A person who is able to do light work is also assumed to be able to do sedentary work unless there are limiting factors such as loss of fine dexterity or the inability to sit for long periods of time.  Id.

(Tr. 20, *see also* Tr. 54-55.)   At the sedentary level,[10] Ms.
Montgomery identified possible positions of a table worker, an
electrical or electronics assembler, or an addresser/mail sorter.
(Id. at 55.)  The ALJ further found that Mr. Talmage was a "younger
individual" (i.e., between 18 and 49), on the date he applied for
benefits, had a high school education and the ability to
communicate in English, and had no past relevant work in which he
had acquired transferable job skills.  Considering these factors,
along with Plaintiff's residual functional capacity, Judge Graffius
concluded there were jobs existing in significant numbers which Mr.
Talmage could perform.  (Tr. 19-20.)  Therefore, Plaintiff had not
been under a disability and was not entitled to benefits at any
time between October 25, 2006, the date on which his application
was filed, and the date of the ALJ's decision.  (Tr. 21.)

   B.   Plaintiff's Arguments

         Mr. Talmage raises four arguments in his brief in support
of his motion for summary judgment, each of which will be addressed
in turn.  Because he raises no arguments concerning his mental
impairments, the Court has omitted references to those conditions
from the following discussion.

_____

         [10] The term "sedentary" describes work which requires lifting no
more than 10 pounds at a time and occasionally lifting or carrying
articles like docket files, ledgers and small tools.  Jobs are
sedentary even if walking and standing are required occasionally and
other sedentary criteria are met.  20 C.F.R. § 404.1567. A sedentary
job should require no more than approximately 2 hours of standing or
walking per eight-hour work day, and sitting should typically amount
to six hours per eight-hour work day.  Social Security Ruling 83-10.

1.   *The ALJ failed to accord adequate weight to the opinions of Plaintiff's treating physician:* Plaintiff argues that Social Security regulations, specifically 20 C.F.R. § 404.1527, set out the elements which are to be "considered in determining the binding effect or weight to be given to the findings and opinions of the treating physicians."   (Plaintiff's Brief in Support of Motion for Summary Judgment, Doc. No. 9, "Plf.'s Brief," at 19.) In addition, binding Third Circuit case law requires that the opinions of treating physicians should not be disregarded without competent contrary advice and opinions.   In this case, the ALJ violated these requirements by adopting the opinion of Brian Geho, the non-medical Social Security evaluator, and did not give appropriate weight to the opinions of Dr. Vincent Lan and Dr. Duree Ahmed, respectively his treating and consulting physicians.   Their conclusions that Plaintiff is limited to less than sedentary work should be given "binding force" because there is no competent contrary medical evidence to rebut their findings.   (Plf.'s Brief at 19-20.)

We begin with a summary of the ALJ's review and analysis of the medical evidence in the record.   Judge Graffius first reviewed the records of Dr. James Sanders, Plaintiff's orthopedist, whose notes cover the period 2003 through 2007.   Dr. Sanders' records, as summarized by the ALJ, refer to Plaintiff's history of multiple

surgeries on his hips, including bilateral hip osteotomies,[11] the last of which was in December 2003. Dr. Sanders reported in June 2007 that Plaintiff's ankle and knee alignment was quite good while standing and that he had no difficulty with walking. He also noted Plaintiff's complaints of discomfort in his elbow after he picked up a pig several months before. (Tr. 15.)

The ALJ further noted that Dr. Mary Beth Cermak, also an orthopedist, had diagnosed Plaintiff's elbow condition as an epiphyseal dysplasia within the capitellum,[12] and this condition was treated by Dr. David Wilson. Dr. Wilson diagnosed Mr. Talmage with a left radial head fracture and subsequent osteochondritis[13] in October and November 2007. Plaintiff underwent arthroscopic surgery on his left elbow for removal of a loose body and debridement of the radial head on March 18, 2008. By May, Plaintiff's symptoms were limited to "a little bit of crepitation" in his elbow but he had a full range of motion, supination and pronation, normal strength, and no swelling or redness. Dr. Wilson released Mr. Talmage, noting that he could resume his full activities as tolerated. (Tr. 15.)

---

[11] An osteotomy is an incision or transection of a bone.   *See* Online Dorland's.

[12] The capitellum, or capitulum, is a small eminence on a bone, such as that on the distal end of the humerus where it articulates with the head of the radius.   *See* Online Dorland's.

[13] Osteochondritis is inflammation of bone and cartilage.   *See* Online Dorland's.

Next, the ALJ turned to the records of Dr. Lan, Plaintiff's primary care physician, whose notes covered the period January 2005 through January 2007.   (Tr. 188-194; 260-261.)   Dr. Lan noted Plaintiff's complaints of pain from his SED and spinal deformity, but according to the ALJ, his records "contain little in the way of objective findings."   (Tr. 16.)   He noted Dr. Lan's residual functional assessment was consistent with his own conclusions, i.e., Plaintiff would be limited to lifting 20 pounds occasionally and 10 pounds frequently, could stand and walk for about 1-2 hours in an 8-hour workday, and could not kneel, stoop, crouch or climb.

Dr. Ahmed, a consulting physician, examined Plaintiff on January 30, 2007.   (Tr. 199-202.)   The ALJ noted Dr. Ahmed's references to Plaintiff's history of SED tarda, spinal stenosis and disc compression, all of which were treated with a potent analgesic.   Despite Plaintiff's complaints of significant pain in his back, hip and leg, Dr. Ahmed reported no edema of his extremities and a normal range of motion in the cervical spine, shoulders, elbows, wrists, hips, knees, ankles and spine. Plaintiff was alert and oriented, with good strength tone and no involuntary movement; his sensation was intact; he could walk on his heels and toes; his gait was stable; and he could get on and off the examining table and rise from a chair without problems.   His calf muscles measured the same bilaterally and there was no muscle atrophy.   Dr. Ahmed concurred with Dr. Lan's findings that

Plaintiff could lift up to 20 pounds occasionally and could engage in occasional postural activities, but should avoid temperature extremes and wetness.  (Tr. 16.)

The ALJ next turned to the summary by Mr. Geho, who concluded that despite his physical problems and subjective complaints, Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, could stand and walk for at least two hours in an eight-hour work day, could sit for six hours, had unlimited ability to push and pull, and could occasionally climb, balance, stoop, kneel, crouch and crawl. (Tr. 16.)

After noting that Plaintiff's subjective allegations of disabling symptoms were inconsistent with his activities of daily living (Tr. 16-17), the ALJ specifically stated why he rejected portions of the reports submitted by Drs. Lan and Ahmed.  First, the ALJ found that Dr. Lan's conclusion that Plaintiff was limited to sitting for only four hours in an eight-hour day, had decreased ability to push and pull with the lower extremities and could not bend were not supported by objective findings in his own office treatment notes, the treatment notes from Drs. Sanders and Wilson, or Dr. Ahmed's findings during the consultative examination. Second, the extent of the restrictions described by Dr. Lan was inconsistent with Plaintiff's activities of daily living. (Tr. 17.) With regard to Dr. Ahmed's findings that Plaintiff could stand and walk for only one hour or less during an eight-hour day, could sit

14

only one-half hour a day, and could push or pull only small objects, the ALJ concluded these were entitled to minimal weight because they were not supported by Dr. Ahmed's own objective findings during the physical examination, nor by any notes from Drs. Sanders, Wilson or Lan or by Plaintiff's activities of daily living.  (Tr. 17.)

Social Security regulations identify three categories of medical sources - treating, non-treating, and non-examining. Physicians, psychologists and other acceptable medical sources who have provided the claimant with medical treatment or evaluation and who have had an "ongoing treatment relationship" with him are considered treating sources.  A non-treating source is one who has examined the claimant but does not have an ongoing treatment relationship with him, for example, a consultative examiner who is not also a treating source.  Non-examining sources, including state agency medical consultants, are those whose assessments are premised solely on a review of medical records.   20 C.F.R. § 404.1502.

Social Security regulations also carefully set out the manner in which medical opinions are to be evaluated.   20 C.F.R. § 404.1527(d).   In general, every medical opinion received is considered.   Unless a treating physician's opinion is given controlling weight, the ALJ will consider (1) the examining relationship (more weight given to the opinion of an examining

source than to the opinion of a non-examining source); (2) the treatment relationship (more weight given to opinions of treating sources); (3) the length of the treatment relationship and the frequency examination (more weight given to the opinion of a treating source who has treated the claimant for a long time on a frequent basis); and (4) the nature and extent of the treatment relationship (more weight given to the opinions of specialist than to generalist treating sources.) 20 C.F.R. § 404.1527(d); see also Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993) (it is well-established that an ALJ "must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all.")  The opinions of a treating source are given controlling weight on questions concerning the nature and severity of the claimant's impairment(s) when the conclusions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2).

We first note that contrary to Plaintiff's description of a treating physician's opinion as "binding," the Third Circuit Court of Appeals has consistently held that while such an opinion "is certainly evidence of a patient's ability to work, it is neither conclusive nor binding on the ALJ." Prokopick v. Comm'r of Soc. Sec., No. 07-1553, 2008 U.S. App. LEXIS 7189, *8 (3d Cir. Apr. 4,

2008); *see also* <u>Winters ex rel. Neinert v. Barnhart</u>, No. 03-1246, 2003 U.S. App. LEXIS 22744, *7 (3d Cir. Oct. 22, 2003). Second, we note that Plaintiff has not taken into account the fact that Dr. Ahmed's opinion – which limits Plaintiff's activities much more severely than that of Dr. Lan – rested entirely on a single consultative examination and thus is entitled to less weight than that of Plaintiff's long-term treating physicians such as Dr. Lan and Dr. Sanders. Moreover, there is no medical evidence in Dr. Ahmed's opinion which supports such severe limitations – for instance, he notes normal range of motion in all skeletal areas (including the wrist and elbow) and no evidence of muscle atrophy, yet he limits Plaintiff to pushing and pulling "small objects." (Tr. 195 and 200.)

As for Dr. Lan's evaluation, there is no evidence in the record which shows that he treated Plaintiff for any conditions related to his SED, stenosis or disc compression, other than prescribing pain medication which Plaintiff testified he took on a very limited basis, i.e., once a week. (Tr. 42.) Rather, Dr. Lan's care was limited to treatment for routine viral attacks and colds and providing school forms.

By contrast, the notes of Drs. Sanders and Wilson, Plaintiff's long-term treating specialists, repeatedly refer to improvements in Mr. Talmage's condition after recovery from surgery. *See*, for example, Dr. Wilson's notes of May 14, 2008, following the elbow

surgery - "no pain or problems, little bit of crepitation, full [range of motion], supination and pronation, normal strength, no swelling, ecchymosis [bruising] or erythema [abnormal redness]." (Tr. 244.)   About two and a half years after the second hip surgeries in December 2003, Dr. Sanders noted on June 30, 2006, that "he has done very well [and]. . .is much more active now [than] he ever was before.   He is not having any significant discomfort in his hips." (Tr. 273-274.)  A year later, Dr. Sanders reiterated that "[h]is hips have not been bothering him for quite a while now," but expressed his concern that "in the long run, his multiple epiphyseal dysplasia will cause increase in his physical disabilities [and] eventually his physical disabilities will probably preclude any type of manual labor." (Tr. 266.)  The Court has been unable to pinpoint any other comment - negative or positive - in Dr. Sanders's note about Mr. Talmage's ability to perform work-related physical activities.   As other courts have noted, an ALJ is entitled to rely on what physicians do not say as well as what they do.   See Lane v. Comm'r of Soc. Sec., No. 03-3367, 2004 U.S. App. LEXIS 10948, *14 (3d Cir. June 4, 2004), citing Dumas v. Schweiker, 712 F.2d 1545, 1553 (3d Cir. 1983); see also Esposito v. Apfel, CA No. 99-771, 2000 U.S. Dist. LEXIS 1720, *12 (E.D. Pa. Feb. 24, 2000), Aley v. Astrue, CA No. 07-1113, 2008 U.S. Dist. LEXIS 45371, *17-*18 (W.D. Pa. June 10, 2008), and Bland v. Astrue, CA No. 06-226, 2009 U.S. Dist. LEXIS 54249, *29 (E.D.

Pa. June 22, 2009) (same.)  As the Court further noted in Lane, the lack of such information in the medical record is particularly persuasive (i.e., "very strong") evidence that such limitations are not severe.  Id.  While there is no question of Plaintiff's diagnoses and their potential debilitating effects, the mere existence of a diagnosis is insufficient to establish disability; rather, there must be functional limitations which prevent the performance of any substantial gainful activity.  Lane, id.

Finally, we note that the ALJ did not err in relying on the conclusions of Mr. Geho rather than those of Plaintiff's treating and consulting physicians.  Much of Mr. Geho's evaluation, and in turn the RFC determined by the ALJ, was precisely adopted from that of Drs. Lan and Ahmed, e.g., the lifting and carrying abilities, postural activities, other physical functions, and environmental restrictions.  The major points of difference were in Plaintiff's ability to sit and stand for a given number of hours in an eight-hour work day.  As Mr. Geho noted, the limitations set by Drs. Lan and Ahmed are inconsistent with the other medical evidence of record and with Plaintiff's ability to engage in comparable activities such as attending school for a full day without any specialized physical assistance.  (Tr. 126-127.)

Social Security Administration reviewers are medical consultants trained in the evaluation of medical factors related to the issue of disability.  Consequently, their opinions are entitled

to some, if not great, weight. *See* <u>Poulos v Comm'r of Soc. Sec.</u>, 474 F.3d 88, 93, n.2 (3d Cir. 2007), *quoting* 20 C.F.R. § 404.1527(f) ("State agency physicians and psychologists are considered to be 'highly qualified physicians and psychologists who are also experts in Social Security disability evaluation,' and the ALJ must consider their findings as opinion evidence.")   Mr. Geho explained the reasoning underlying his determination and the ALJ in turn explained why he adopted in large part the limitations identified by Mr. Geho. *See* <u>Jones v. Sullivan</u>, 954 F.2d 125, 128-129 (3d Cir. 1991) (an ALJ may rely on the opinion of a state agency physician when that opinion is consistent with the record.) Because it is not the task of this Court to re-weigh the evidence, where the ALJ has explained his reasoning and his conclusions are consistent with the evidence as a whole, we will affirm his decision even if we would have reached a different conclusion. <u>Landeta v. Comm'r of Soc. Sec.</u>, No. 05-3506, 2006 U.S. App. LEXIS 20905, *14 (3d Cir. Aug 14, 2006).   We therefore find Plaintiff's first argument unpersuasive.

      2.   *The ALJ failed to consider all of Plaintiff's severe and non-severe impairments in combination and the combined impact of those impairments on his functional capacity:*   Mr. Talmage argues that the ALJ failed to consider a number of conditions other than those identified at Step 2 of the analysis, specifically,

lumbar spondylitis[14] causing aching and stiffness in Plaintiff's back; a compression deformity at T-11 and T-12, ankle pain resulting from an irregularity and defect of the talar; severe pes planus; bilateral quadriceps atrophy; and environmental restrictions such as avoiding poor ventilation, heights, moving machinery, vibrations, temperature extremes, chemicals, wetness, dust, noise, fumes and humidity.  The ALJ's failure to address these non-severe but acknowledged conditions violated Social Security rulings and Third Circuit precedent.  This problem was exacerbated by the ALJ's reliance on the Social Security adjudicator's report.  (Plf.'s Brief at 20-22.)

We have previously noted that the ALJ's reliance on the Social Security reviewer's report was not improper.  We further note that many of the allegedly omitted environmental limitations identified by Plaintiff are, in fact, incorporated in the ALJ's RFC description, e.g., Plaintiff "must avoid cold temperature extremes, excessive vibration and extreme dampness and humidity."  (Tr. 15.) References to other limitations, e.g., avoiding poor ventilation, heights, moving machinery, temperature extremes, chemicals, dust, noise, and fumes, appear only in Dr. Lan's report and are not supported by medical evidence in his own records or elsewhere.

As for the other physical limitations, we also find no

---

[14]  Spondylitis is the serious and chronic inflammation of the vertebrae.  *See* Online Dorland's.

evidence that they create restrictions in Plaintiff's ability to work in addition to those already recognized by the ALJ. For instance, notes from an examination on October 4, 2004, indicate that "both ankles collapse into valgus[15]" but surgical intervention was not recommended at the time because there were no symptoms associated with the condition. (Tr. 290.) Ankle pain from the defect in Plaintiff's left talar was reported on June 30, 2006 (Tr. 271), and was treated conservatively with an orthotic device and physical therapy. (Tr. 273-275; 116.) On January 30, 2007, Dr. Ahmed noted a normal range of motion in Plaintiff's ankles, and the ability to walk on heels and toes, and to maintain a stable gait. (Tr. 201.) There are also references to Mr. Talmage's severe pes planus or flat feet (Tr. 253, 290), but the Court has been unable to identify any specific treatment for this condition. Even if we were to accept the argument that these conditions affect his ability to stand or walk for extended periods of time, Mr. Talmage has failed to explain how they limit his ability to work to a greater extent than the conditions the ALJ already considered.

Plaintiff's lumbar spondylitis appears to have been recognized only by Dr. Govindaraj V. Mohan in an x-ray of his lumbosacral spine taken on May 19, 2004, when a compression deformity of T-11 and T-12 (two of the lower thoracic vertebrae) was noted, with the

---

[15] "Valgus" denotes a deformity in which the angulation is away from the midline of the body. *See* Online Dorland's.

comment that it was most likely chronic rather than acute in nature.   The lumbar vertebral bodies appeared to be osteoporotic and mild disc space narrowing was seen at L4-L5 (lumbar region) and L5-S1 (lumbosacral region.)   (Tr. 291.)   In reading an x-ray taken on April 28, 2005, in response to Plaintiff's complaint of back pain, Dr. Jeanne Bauman noted "some compression to the superior endplates of L1 and L2 vertebral bodies [and] . . . flattening to the T11 and T12 vertebral bodies."   (Tr. 285.)   Dr. Sanders commented the same day that while Plaintiff was a candidate for fusion of the vertebrae, part of his problem was Plaintiff's waddling Trendelenburg gait[16] for which Dr. Sanders recommended exercise to strengthen his hip abductor muscles.   Mr. Talmage agreed that the pain was not bad enough to warrant surgery.   (Tr. 286.)   On June 30, 2006, Dr. Sanders again referred to Plaintiff's back pain, but noted that x-rays of his lumbar spine and pelvis showed no significant abnormalities; he again prescribed strengthening exercises.   (Tr. 273-274.)   The Court has been unable to find references to ongoing back pain after June 2006.   Again, the ALJ noted these conditions in his analysis (Tr. 16) and they are accommodated by the limitation to lifting and carrying no more than 10 pounds on an ongoing basis and by limiting the number of hours spent sitting, standing and walking.

---

[16]   Trendeleburg gait refers to an abnormal mode of walking caused by weakness of the abductor muscles of the lower limb and buttocks. See entry at wikipedia.org. last visited February 1, 2010.

23

Finally, Plaintiff's bilateral quadriceps atrophy is mentioned only in Dr. Sanders' notes of April 28, 2005, when Mr. Talmage was experiencing pain in his knees and back.[17]   (Tr. 286.)   He was prescribed exercises for strengthening his quadriceps. (Tr. 287.) On June 1, 2005, he underwent surgery to remove hardware from his left hip which Dr. Sanders suspected may have been causing some of the pain.   (Tr. 277-278.)   Dr. Sanders subsequently noted "some quad weakness on the left side" in a post-operative exam on July 18, 2005.   (Tr. 275.)   On January 30, 2007, Dr. Ahmed noted no muscle atrophy.   (Tr. 201.)   Thus, it appears the only period in which atrophy was a problem was in 2005, well before period in question, i.e., October 2006 through September 2008.

While the ALJ may not have specifically mentioned such short-term conditions as the bilateral quadriceps atrophy or the spondylitis recognized only by Dr. Mohan on one occasion, his decision reflects a thorough review of the medical record and other evidence.   Plaintiff has failed to identify any limitations which would arise from his lumbar spondylitis and spinal deformity, ankle pain, pes planus, bilateral quadriceps atrophy, and the noted environmental restrictions which would affect the ALJ's overall RFC determination.   We conclude that had the ALJ specifically referred to those conditions in his RFC determination, their inclusion would

---

[17]   Dr. Sanders did refer to "bilateral quadriceps weakness" at a March 10, 2003, check-up following Plaintiff's hip surgery in December 2002, and recommended "aggressive physical therapy" for abductor, quadriceps and hamstring muscle strengthening.   (Tr. 309.)

not have resulted in a finding of disability.  Therefore, this case does not require remand for further consideration on that basis.  *See* <u>Rutherford</u>, 399 F.3d at 553 (where error arising from the ALJ's failure to comply strictly with Social Security regulations is harmless and would not affect the outcome of the case, remand is not warranted); <u>Marshall v. Astrue</u>, CA No. 07-973, 2009 U.S. Dist. LEXIS 10747, *18 (W.D. Pa. Feb. 12, 2009) (same.)

        3.   *The ALJ failed to conduct a valid function-by-function analysis as required by Social Security Ruling 96-8p in determining Plaintiff's RFC:*  Mr. Talmage argues that Social Security Ruling[18] ("SSR") 96-8p requires the ALJ to consider separately each of seven strength demands – sitting, standing, walking, lifting, carrying, pushing and pulling.  Because the ALJ omitted consideration of several medical conditions, by default, he did not comply with this regulation and his decision should be vacated.  (Plf.'s Brief at 22-23.)

    According to SSR 96-8p, "Assessing Residual Functional Capacity in Initial Claims," at step four of his analysis, the ALJ is to consider separately the seven strength demands listed above,

---

[18]  "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'" <u>Sykes</u>, 228 F.3d at 271, *citing* 20 C.F.R. § 402.35(b)(1); <u>Williams v. Barnhart</u>, No. 05-5491, 2006 U.S. App. LEXIS 30785, *8 (3d Cir. Dec. 13, 2006). "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same." <u>Sykes</u>, <u>id.</u>, *quoting* <u>Heckler v. Edwards</u>, 465 U.S. 870, 873 n.3 (1984).

also referred to as exertional limitations.  The RFC is not to be expressed initially in terms of the exertional categories or the ability to perform sedentary, light, medium, heavy or very heavy work; rather, this determination is made after each of the seven exertional limitations is independently considered.  <u>Alexander v. Barnhart</u>, No. 02-5046, 2003 U.S. App. LEXIS 18202, *15-*16 (10th Cir. Sept. 2, 2003)(the RFC finding must contain the required function-by-function assessment based on all relevant evidence.)

In the ALJ's discussion of Mr. Talmage's exertional limitations, he specifically referred numerous times to forms completed by Dr. Lan and Dr. Ahmed.  In particular, he noted Dr. Lan's comments that Plaintiff had the ability to *lift* 20 pounds occasionally and 10 pounds more frequently; could *stand* and *walk* one to two hours in an eight-hour work day (Tr. 16); could *sit* only four hours in an eight-hour work day; and had decreased ability to *push and pull* with his lower extremities (Tr. 17.)  He similarly mentioned Dr. Ahmed's findings on those same exertional capacities and explained his reasoning for rejecting or accepting each physician's findings in that regard.  (<u>Id.</u>)  We agree Judge Graffius did not explicitly refer to Plaintiff's ability to *carry* items, but the form completed by Dr. Lan – which the ALJ surely reviewed in detail – indicates that Plaintiff could carry up to 10 pounds frequently and 20 pounds occasionally. (Tr. 190.)  Dr. Ahmed expressed no conclusion on this question.  (*See* Tr. 195.)  We have

carefully reviewed the other medical records and find no explicit references therein to Plaintiff's abilities to perform the seven exertional functions.

Regarding Plaintiff's argument that because the ALJ failed to consider several medical conditions, his analysis of Plaintiff's RFC was incomplete, as discussed in the previous section, Mr. Talmage has failed to identify any effects those conditions would have on his exertional abilities which would be greater than the conditions the ALJ did specifically address. Again, remand for further consideration of this question would not, we conclude, lead to a different result and is therefore unnecessary.

4. *The ALJ failed to consider whether Plaintiff's stenosis met Listing 1.04 and if he was therefore qualified for disability benefits:* Again, Plaintiff argues that the ALJ improperly relied on the findings of the non-medical adjudicator to rebut the findings of Plaintiff's treating physicians, both of whom limited him to less than sedentary work. In particular, the ALJ failed to take into account Plaintiff's severe pain in his spinal area which limited his movement. Plaintiff clearly meets Listing 1.04 which requires a loss of function due to this condition. (Plf.'s Brief at 23-24.)

Spinal stenosis is discussed under Listing 1.04, disorders of the spine. The threshold requirement for meeting this Listing is that the disorder must have resulted "in compromise of a nerve root

(including the cauda equina[19]) or the spinal cord." Plaintiff argues that "once the competent evidence of record is considered," he must be considered disabled (Plf.'s Brief at 18), but he does not point to such evidence and the Court's review has been equally fruitless. Next, the medical record must contain evidence of:

> A. . . . nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg raising test (sitting and supine);

> OR

> B. Spinal arachnoiditis,[20] confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every two hours;

> OR

> C. Lumbar spinal stenosis resulting in pseudo-claudication[21] established by findings on appropriate medically acceptable imaging, manifested by chronic non-radicular pain and weakness, and resulting in inability to ambulated effectively, as defined in 1.00B2b.

---

[19] The cauda equina is the collection of spinal roots descending from the lower spinal cord and occupying the vertebral canal below the cord. See Online Dorland's.

[20] Arachnoiditis is inflammation of the arachnoid, the membrane between the dura mater and the pia mater of the spinal cord. *See* Online Dorland's.

[21] Pseudoclaudication refers to painful cramps in the buttocks, legs and feet while walking or standing, caused by spinal, neurological or orthopedic disorders, including spinal stenosis. See www.mayoclinic.com/print/pseudoclaudication/HQ01278/METHOD=print, last visited January 27, 2010.

Listing 1.04, Disorders of the Spine.

Plaintiff has not pointed to specific medical evidence to support a finding that he met any one of the three criteria for Listing 1.04. Nor has he identified which of the three related criteria is satisfied. Dr. Ahmed refers in his notes to the fact that this was one of Mr. Talmage's diagnoses (Tr. 199), but a careful review of the medical records from Dr. Sanders, his long-term treating osteopath, reveals no specific mention of spinal stenosis or of any of the criteria. In fact, on June 30, 2006, Dr. Sanders noted that although Mr. Talmage was complaining about "some discomfort in his low back area, particularly with weather changes," an x-ray of his hip area showed no further deterioration over time, and no "significant abnormalities" in the lumbar spine. Dr. Sanders prescribed exercises to alleviate the "irritation he gets because of the increased motion around his hips." (Tr. 273.) He did not attribute any loss of function to spinal stenosis.

"'For a claimant to show his impairment matches a listing, it must meet *all* of the specified medical criteria.'" Jones v. Barnhart, 364 F.3d 501, 504 (3d Cir. 2004), *quoting* Sullivan v. Zebley, 493 U.S. 521, 530(1990) (emphasis in original.) Here, Plaintiff has failed to show that his spinal stenosis has resulted in nerve root or spinal cord compression and any one of the three related conditions. We conclude that the ALJ did not err in finding that Mr. Talmage's spinal stenosis did not meet Listing

1.04.

    Having considered each of Plaintiff's arguments, we find no reason to remand this case due to errors on the part of the ALJ. Defendant's motion for summary judgment is therefore granted and Plaintiff's motion is denied.  An appropriate order follows.

February __24__ , 2010         _William L. Standish_

                                William L. Standish
                        United States District Judge